STATE OF MONTANA, Plaintiff and Respondent,
v.
GLENN EUGENE TOTTERDELL, Defendant and
Appellant.
No. 9973.
Submitted March 12, 1959. Decided March 19, 1959.
336 Pac. (2d) 696.

Robert T. Merrill, Great Falls, for appellant.
Forrest H. Anderson, Atty. Gen., Louis Forsell, Asst. Atty.

Gen., Gene B. Daly, County Atty., Great Falls, for respondent. Louis Forsell, Asst. Atty. Gen., argued orally.

MR. JUSTICE CASTLES:

This is an appeal from a judgment of conviction of first degree assault on a verdict of a jury and from an order denying a new trial.

The charge arose out of a shooting. One Richard Brown was shot in the back in the evening of July 26, 1957, as he ran from a house in which the defendant lived. The defendant fired twice from the doorway; the second shot felling Brown as he reached the street. At the time of the trial Brown was still paralyzed below the thorax and it appears that he may be crippled for life.

The events leading up to the shooting are as follows: The defendant came to Great Falls with his children from Idaho the first week of July 1957. His wife, from whom he had been separated for eighteen months, came to Great Falls shortly after in order to be near her children and see them from time to time. She had previously worked as a prostitute and she found work as such in Great Falls at the Doyle Apartments where she worked about ten days.

The victim of the assault, Richard Brown, lived at the Doyle Apartments. He denied that he knew the defendant's wife but she testified that he had asked to be her pimp.

The defendant's wife left the Doyle Apartments to return to her husband, the defendant. The defendant was out of town when she arrived at his residence but returned three days later, the day of the shooting. Upon his return his wife informed him that money was owing her and some of her personal effects, earrings and a tear gas pencil, were being kept by the madam of the house of prostitution. She also told him, according to defendant's version, that the victim, Richard Brown, had called her several times about going back to work as a prostitute.

Immediately after this, she went to dinner at an apartment downstairs with a couple who lived there. During this absence,

Brown came to the defendant's house to deliver the money and articles. He asked the defendant if "Betty Jackson" lived there. It appears that defendant's wife had aliases, one of which was Betty Jackson. The defendant said no, and Brown left, either frightened away according to the defendant's version or simply because he was unable to find "Betty Jackson" to deliver the money and articles as he had been requested to do. In any event, Brown left and came back some time later, to again try to deliver the money and items to Betty Jackson.

In the meantime the defendant had told his wife of the first visit and been informed of the probable identity of the visitor, Brown. On this trip, Brown drove a Cadillac owned by one Leo LeMar, one of the operators of the Doyle Apartments, bringing as a passenger one Murdock. Brown parked the car across the street from the defendant's house, went to the house and asked for Betty. He left the money, earrings and tear-gas pencil inside the door; then left in a hurry.

The defendant was there to meet him and picked up a .32-calibre revolver, went to the doorway and as Brown ran, fired two shots, the second one hitting Brown as previously said. Defendant then went out of the house to the street, spoke to Murdock and made him get out of the car and go over to his fallen friend Brown.

There were eyewitnesses to the shooting of Brown, passersby who saw him running, heard the two shots, saw him fall, heard incriminating statements by the defendant, saw the gun in defendant's possession, and in many ways testified about the shooting. In very short order, the police arrived and the defendant talked freely to them expressing again and again that he shot Brown, was glad he did, and hoped he would die.

The foregoing sketchy recitation of a sordid story of human garbage is set out because of the nature of the defendant's specifications of error on this appeal. The evidence of the State was overwhelming as to the shooting of Brown by the defendant. The general tone of the defense at the trial was an effort to show a justification for the shooting which might show a lack of an

assault. This pattern of defense to justify the assault seemed to lend itself to a story of an awful character, Brown, trying to lure the defendant's 21-year-old wife into a den of prostitution.

The woman involved, the defendant's wife, was an admitted prostitute who claimed ownership of a tear-gas pencil and a "belly-buster" gun described as having the serial numbers partly filed off. The complete story reveals that at the age of 21 she had worked as a prostitute in at least three states, borne two illegitimate children, and completed the fourth grade of school. Her husband seemed to accept these facts and wanted her to resume living with him and undertake the duties of a wife and mother. This is the woman whose virtue the defendant says he was defending.

Regardless of the sordid nature of the record of these people's activities, the cardinal fact remains: A human being, Richard Brown, was shot in the back while in full retreat and apparently crippled for life.

The trial progressed with the State calling the doctor who treated the victim, then police officers who described the situation found at the scene of the shooting and certain admissions made by the defendant at the time of their arrival at his home.

The admissions made by defendant were repeated by several witnesses. They were about as follows: "I shot him and I hope to hell he dies"; "I shot the black son-of-a-bitch and I hope to hell he dies"; if he'd known Mr. Murdock was one of "them whore house s.o.b.'s" he would have shot him too; "Go ask that black son-of-a-bitch" meaning Brown who was already in the hospital; "ask him the reason he come up here, it was to get my wife to go back to work in that damn whore house."

These are but samples of the testimony as to admissions of the defendant. Defendant's counsel was not to be outdone on this type of testimony, he requiring the witnesses to repeat it numerous times during cross examination. Of one witness, Officer Kelly, who had testified that the defendant had said, "If I had known he [Murdock] was one of those whore house s.o.b.'s, I'd have shot him too," defense counsel asked the following

question: "Are you sure that when Mr. Totterdell was talking to you that he didn't say "those pimps" instead of those "whore house s.o.b.'s?""

With this description of some details of the proof of the assault, perhaps our discussion of the specifications of error will have some meaning. To set out the specifications is rather startling unless the sordid story has been unveiled to some extent.

Specifications of error numbers 1, 2, and 4, are directed to evidence brought out, or questions improperly asked, by the county attorney. The basic complaint is that these matters tended to degrade the defendant and his wife in the eyes of the jury. We might say at this point that the transcript before us runs to 492 disgusting pages and the matters complained of are far from the worst that appear therein.

Specifications of error numbers 1 and 4 deal with questions ▆ put by the prosecutor in such a way that they might be thought to imply that the defendant was acting or had acted as a "pimp" for his wife. However, examination of the record indicates that in neither instance is the reference clearly to the defendant when the word "pimp" appears. This word, incidentally, first appears in the record when used by the defendant's counsel.

But even if the reference to the defendant is properly taken, ▆▆ these matters are so insignificant when compared with the balance of the record that they could not be found to be prejudicial error. Before this court will reverse a judgment, prejudice must be shown. State v. Byrd, 41 Mont. 585, 592, 111 Pac. 407; State v. Hall, 55 Mont. 182, 188, 175 Pac. 267; State v. Hay, 120 Mont. 573, 582, 194 Pac. (2d) 232. In addition we might comment that no motion to strike or to admonish the jury was made in any instance.

Specification of error number 4 involves a question directed to Helen Totterdell on cross-examination. She appeared as a defense witness: "Q. What was your position there, or profession? A. Prostitute."

The "there" referred to in the question is Elko, Nevada,

where the witness had lived for some time prior to coming to Montana. On the preceding direct examination the fact that Mrs. Totterdell worked as a prostitute in Great Falls was brought out and a great part of her testimony concerned a dispute between her and the madam over some property taken from her room and money withheld from her. During this examination she also claimed ownership of the tear-gas pencil and the ''belly-buster'' gun. It is inconceivable that the prosecutor's question or the answer could have injured her character in the eyes of the jury. She had no character left at the conclusion of the direct examination. In the great mass of unsavory evidence about her, this matter is insignificant.

As specification of error number 5, the appellant complains of an attempt by the county attorney to introduce into evidence State's proposed exhibit No. 13. The exhibit was refused but from the testimony and the offer of proof made by the State it appears that the exhibit was a certified copy of a record of conviction of Helen Totterdell of an unspecified misdemeanor in Pendleton, Oregon. According to the offer of proof, the prosecutor's intention was to prove that Helen Totterdell used the name of Betty Jackson as an alias for the purpose of showing that when Richard Brown asked the defendant for Betty Jackson the defendant knew he referred to his wife, Helen.

Counsel for the defendant in his brief makes much of the asserted fact that this exhibit was done up with large seals and ribbons and that the county attorney waved it before the jury in such a manner that it created a prejudicial effect on the jury. This may be the fact but the record does not disclose it, or even hint at it. Appeals can only be taken on the record made, not on the record which should have been made. The exhibit was not admitted and we do not have any basis to assume any prejudice from any other use of it. State v. Prouty, 60 Mont. 310, 313, 314, 199 Pac. 281; State v. Byrd, supra; State v. Hay, supra; State v. Ruona, 133 Mont. 243, 321 Pac. (2d) 615. The specification is not well-taken.

Specification of error number 7 is predicated on the assertion

that the evidence is insufficient to prove intent to kill, as alleged in the information. If the fact that the defendant fired two shots at the victim is insufficient to prove this intent, which we doubt, surely the admissions of the defendant quoted earlier and which were made shortly after the event while the defendant was still quite excited are sufficient evidence to convince the jury byond a reasonable doubt that the defendant intended to kill Richard Brown. We find the evidence clearly sufficient to uphold the verdict.

The sixth specification of error deals with the denial of defendant's motion for a new trial. The grounds for the motion were the same as claimed for error on this appeal, are discussed elsewhere, and need no further comment. They were not well-taken then and have not improved since.

The judgment of conviction is affirmed.

MR. JUSTICES ADAIR and ANGSTMAN, and THE HONORABLE LESTER H. LOBLE, District Judge, sitting in place of MR. CHIEF JUSTICE HARRISON, and THE HONORABLE PHILIP C. DUNCAN, District Judge, sitting in place of MR. JUSTICE BOTTOMLY, concur.