No. 81-57

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

_____

JAMES JAY LELAND,

    Plaintiff and Appellant,

-vs-

STANLEY J. HEYWOOD, et al.,

    Defendants and Respondents.

_____

Appeal from:  District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone, The Honorable
Charles Luedke, Judge presiding.

Counsel of Record:

    For Appellant:

        Stephens & Cole, Billings, Montana

    For Respondents:

        LeRoy H. Schramm, Montana University System,
Helena, Montana

_____

Submitted on Briefs:  September 25, 1981

Decided:  April 15, 1982

Filed: **APR 1 5 1982**

Thomas J. Kearney
Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

Leland, a non-tenured college professor at Eastern Montana College (EMC), appeals the Yellowstone County District Court's judgment that his due process rights were not violated by EMC's refusal to provide him with a formal hearing before terminating his employment.

Leland contends that the judgment should be reversed because the trial court failed to consider that EMC's president verbally supplemented the printed terms of Leland's employment contract, and because the trial court found that he had failed to accept the contract that was offered him. We affirm the trial court's judgment on all the issues.

Leland was hired at EMC in 1966 as a Philosophy and Humanities professor. From 1968 until 1970, he took a leave of absence without pay in order to work on his doctorate degree. He returned to EMC, and although he had not yet attained his doctorate degree, he was promoted to Assistant Professor in 1970.

On February 13, 1973, Leland applied to EMC's Rank and Tenure Committee for promotion to Associate Professor, which would entitle him to tenure. He was informed, however, that although he was eligible for this promotion, the Committee would not recommend it because it had been made aware that he was to be recommended for a "terminal contract" at the April 1973 meeting of the Board of Regents. A "terminal contract" is one in which the professor is hired to teach for another school year, and is then terminated. In effect, it provides the professor with more than 12 months notice of his non-retention.

On February 14, 1973, defendant Moulton, Leland's supervisor and Chairman of the Division of Humanities, notified Leland that he (Moulton) had recommended to defendant Rodney, Dean of the College of Liberal Arts, that Leland not be reappointed as an Assistant Professor, but that he be offered the "terminal contract" for the 1973-74 school year. The next day, Dean Rodney informed Leland that he supported Chairman Moulton's recommendation because Leland allegedly had been making unacceptable advances toward female students, had been conducting classes while under the influence of alcohol, and had taken one of his classes to the Student Union. Leland did not attempt to explain or refute these accusations, but requested a formal hearing, which Dean Rodney refused. Defendant Heywood, President of EMC, then informed Leland that he also would recommend the "terminal contract."

Leland then wrote Professor Fargo, President of EMC's Faculty Senate, requesting a hearing and a written statement of the allegations of misconduct behind his termination. On March 1, 1973, he also sent notice of these requests to President Heywood, but on March 5, 1973, received President Heywood's reply that he would nonetheless recommend the "terminal contract."

Professor Fargo presented these requests to the Faculty Senate on March 6, 1973. The next day, Leland wrote a letter to State Representative Lloyd Lockrem criticizing the funding of a proposed science building at EMC and the number of EMC's administrative personnel, stating that EMC's priority should be to retain its present faculty and to encourage research. On March 20, 1973, President Heywood wrote Leland and criticized him for writing to Lockrem without first

proceeding through the appropriate channels at EMC. President Heywood also sent the Board of Regents a copy of Leland's letter along with the recommendation that Leland receive only a "terminal contract."

On April 11, 1973, Leland was notified that the Board of Regents had approved the offer of a "terminal contract" to Leland. Leland then requested, but was denied, a formal hearing by the Board of Regents. Leland received the "terminal contract" in the mail under the usual hiring procedure in which he was to sign it and return it within 21 days if he accepted the employment. On April 27, 1973, Leland's attorney requested that the Board of Regents extend the time in which Leland could accept the contract, pending the outcome of his dispute over being denied a hearing. Leland alleges that he requested this time extension because the Board of Regents has granted such an extension under similar circumstances in the past. The Board of Regents, however, demanded that Leland immediately sign and return the contract, or it would consider the contract as voided and terminate his employment on June 30, 1973. Later, Leland was told that the Board of Regents, at its May 21, 1973 meeting, had terminated his employment effective June 30, 1973, because the "terminal contract" had not been signed and returned. Leland continued on as Assistant Professor for the rest of the 1972-73 school term while seeking assistance from the EMC Chapter of the American Association of University Professors (AAUP).

Leland argues that from the date of his termination on June 30, 1973, through June 20, 1980, he made $19,881.41, and claims that had he not been wrongfully terminated, he

would have earned a total of $92,495 as an Assistant Professor during those years, and as much as $96,728 if he had been promoted to an Associate Professor by 1973. He therefore claims a loss in earnings between $72,613.59 and $76,846.59. He also argues that the terms of his employment contracts from 1972 through 1974 include certain AAUP standards allegedly adopted by EMC, but not printed on those employment contracts.

He commenced this action seeking (1) his reinstatement at EMC with the rank of Associate Professor; (2) his lost salary; and (3) $10,000 exemplary damages. After a nonjury trial on March 26 and 27, 1980, the District Court concluded that Leland did not have tenure and therefore was not entitled to a hearing or a statement of reasons concerning his non-reappointment beyond the 1973-74 school year. We agree.

Leland contends that the District Court should have found that he accepted EMC's offer of employment for the 1973-74 school term while merely questioning the legality of its termination provision and that under the policies in effect at EMC at the time, EMC was obligated to renew his appointment as Assistant Professor. He also contends that the District Court should not have concluded that he would have been offered the terminal contract even if he had not sent the letter to Representative Lockrem.

We reject Leland's contention that there was insufficient evidence for the District Court to conclude that he failed to accept the terminal contract which had been offered him.

On April 9, 1973, Leland was offered the "terminal contract" for the 1973-74 school year which indicated that

-5-

he had 21 days to accept the offer. Paragraph 5 of the contract makes it clear that nontenured faculty have no expectation of the right to renew their contract. Leland never signed or returned the contract for 1973-74, but explained that his refusal to sign it was based on his objection to its terminal nature. In other words, he refused EMC's offer and made a counteroffer: "Give me a contract without the terminal provision." EMC was, of course, under no obligation to offer a nontenured employee an unconditional contract. However, EMC did not silently allow the offer to lapse after the 21 day period. Rather on May 7, 1973, the offer for a terminal 1973-74 contract was repeated in the letter to Leland's attorney. When the contract remained unsigned, EMC let his 1972-73 contract expire at its normal date.

Leland cannot fairly contend that, on the basis of the Board of Regents' May 7, 1973 letter, he believed that the Board of Regents had waived the 21-day time limit for accepting the contract. That letter unequivocally stated:

> ". . . Our record indicates Mr. Leland has had his proposed contract since April 12, 1973. Under the contract agreement this would have given him until Monday, April 25, 1973 to return it. We must request that the contract be signed and submitted to the President of Eastern Montana College immediately upon receipt of this letter, or we will consider that Mr. Leland has voided his contract and his employment with the Montana University System will cease as of the expiration of his present contract, which is June 30, 1973." (Emphasis added.)

Nor can the April 27, 1973 letter from Leland's attorney be said to clearly show that he accepted the offered employment, while merely questioning the legality of the contract's terminal nature. That letter stated:

-6-

". . . We have determined that there are basic requirements that must be met after a certain period of time relating to tenure of university professors. As a consequence, we wish to respectfully advise you that the terminal contract which you have provided Professor Leland is improper and that Professor Leland is entitled to the benefits of tenure. We wish to make a formal demand upon you to submit a proper contract based upon Professor Leland's continuous service for the university system.

"It is our further intention by this letter to notify you of our intention to extend the time in which the contract by its terms is to be returned, pending a final disposition of this matter.

". . ."

We also reject Leland's argument that the District Court should have found that there were existing rules and understandings in effect at EMC in 1972 which supplemented the tenure regulations on the reverse side of EMC's Faculty Employment Contracts. The only evidence Leland offered in support of these alleged supplemental rules and understandings was that President Heywood made certain statements regarding his concepts of tenure policies in his Address to the Faculty at the beginning of the 1972-73 school year, which was four months _after_ Leland had signed and returned his 1972-73 employment contract. These comments, however, cannot be said to clearly establish a tenure policy that any of the faculty could rely upon. Heywood stated:

". . . There has been no serious dislocation of people as the administration took a serious but humane approach to our fiscal problems. I undertake to continue this policy and to protect to the limit of my ability those who have been on the faculty long enough to have acquired tenure according to the AAUP."

This comment only displays President Heywood's _intent_ to request that the Board of Regents change the existing tenure system to the system advocated by the AAUP (where tenure is automatic after seven years of teaching at that institution).

-7-

Further, college administrators in this state have no authority to contract with faculty members on terms different than those approved by the Board of Regents. Brown v. State Board of Education (1963), 142 Mont. 547, 385 P.2d 643. Leland has not established with any credible proof that the written tenure provisions of his contract were supplemented by any oral representations of EMC's administration, and therefore, we need not discuss Leland's claim that these representations gave him a property interest in his re-employment and a liberty interest in his good name, reputation, and honor.

Leland has attempted to show that he was "dismissed for cause" because he accepted the contract offered to him for 1973-74 and because he was entitled to tenure based upon President Heywood's oral representations. This claim must also fail because we have already ruled that Leland did not accept the offered contract and that he was not entitled to rely on President Heywood's comments.

In Board of Regents v. Roth (1972), 408 U.S. 564, 567, 92 S.Ct. 2701, 2704, 33 L.Ed.2d 548, 555, the Supreme Court recognized and described the distinctions between a dismissal for cause and nonretention:

> "The procedural protection afforded a Wisconsin State University teacher before he is separated from the University corresponds to his job security. As a matter of statutory law, a tenured teacher cannot be 'discharged except for cause upon written charges' and pursuant to certain procedures. A nontenured teacher, similarly, is protected to some extent during his one-year term. Rules promulgated by the Board of Regents provide that a nontenured teacher 'dismissed' before the end of the year may have some opportunity for review of the 'dismissal.' But the Rules provide no real protection for a nontenured teacher who simply is not re-employed for the next year. He must be informed by February 1 'concerning retention or non-retention for the ensuing year.' But 'no reason for non-retention need be given. No review or appeal is provided in such case.'" (Emphasis in original; footnotes omitted.)

Montana's educational laws and contracts mirror those of Wisconsin. The evidence shows that the plaintiff was not removed for cause. Simply, he was a non-tenured teacher who was not retained.

Finally, we also reject Leland's contention that his employment was terminated because he exercised his constitutional right to free speech by writing a letter to Representative Lockrem. Leland's letter to Representative Lockrem was sent 3 1/2 months <u>after</u> Chairman Moulton first recommended to Dean Rodney that Leland not be reappointed, and two days <u>after</u> President Heywood wrote Leland that he did not intend to retain him. Both Chairman Moulton and President Heywood testified that Leland's letter to Representative Lockrem played no role in their decisions, and Leland himself testified that he did not believe that this letter had anything to do with his nonretention.

The judgment of the District Court is affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____
Justices

-9-