No. 85-104

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

---

STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

JAMES M. BRODNIAK,

Defendant and Appellant.

---

APPEAL FROM: District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable James B. Wheelis, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Ferguson & Mitchell; Carol A. Mitchell argued,
Missoula, Montana
C. William Boggs argued, Missoula, Montana

For Respondent:

Mike Greely, Attorney General, Helena, Montana
Dorothy McCarter argued, Asst. Atty. General
Robert L. Deschamps, III, County Attorney, Missoula,
Montana; Karen Townsend argued, Deputy County Atty.

---

Submitted: February 6, 1986

Decided: April 30, 1986

Filed: **APR** 3 0 1986

_Earl M. Harrison_
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Appellant, James Brodniak, appeals from a judgment of conviction of sexual intercourse without consent after a jury verdict in the District Court, Fourth Judicial District, County of Missoula.

The facts of this case are as follows: on the evening of May 10, 1984, Debbie Preston, a 22-year-old woman, accompanied a friend, Diane Green, to a bowling league banquet at the Press Box in Missoula. While at the Press Box, Preston consumed six drinks. At approximately 9:30 p.m., the two women left the Press Box and went to the Trails West Tavern in Missoula.

Upon entering the Trails West, Preston observed Brodniak whom she had met once before. The two women then joined a third woman, Diane Gettes. Eventually, Brodniak came over and sat with the three women. While at the Trails West, Preston consumed four more drinks.

At approximately 1:30 a.m., Green announced she had to go home. Preston testified that she was not ready to go home yet so rather than leaving with Green, she accompanied Green to her car to retrieve her belongings and then returned to the bar with the intention of asking Gettes for a ride home. Preston, further, testified that when she returned from retrieving her belongings from Green's car, she asked Brodniak for a ride home because she could not find Gettes in the bar. Gettes, however, testified that Preston had made plans to leave with Brodniak before Green ever left the bar and that when Green asked Preston if she wanted a ride home,

Preston said, "No, I'm going with him. We are going to get a case and talk." Gettes also testified that she had not left the bar while Preston was retrieving her belongings, but had briefly gone to the restroom.

At approximately 1:45 a.m., Preston left the Trails West with Brodniak. From the Trails West, the two drove to a nearby Mini Mart to buy a six pack of beer, as Preston had agreed to "have a drink of beer and go talk." They then drove to a dormitory parking lot at the University of Montana. Both Preston and Brodniak agreed that while at the parking lot they drank some beer and talked. Brodniak, however, further testified that he and Preston "started making out" while at the parking lot.

From this point the testimony of Preston and Brodniak conflicts. Preston testified as follows: after drinking some beer and talking for a while at the university parking lot, she asked Brodniak to take her home because she was tired. Brodniak told her he would take her home, but instead drove to Pattee Canyon. Upon leaving the university parking lot, Brodniak turned the wrong direction to take Preston home, but it did not dawn on her. After realizing they were going to Pattee Canyon, Preston told Brodniak she didn't want to go there because she was afraid of the area. She had heard about devil worshippers in the area. Upon arriving in Pattee Canyon, Brodniak parked by the campground, then grabbed Preston's hair and reached across her and locked the door. Brodniak told her he wanted to make love to her and she responded "No." He then forced her to commit oral sex, making her take off all her clothes, including her shoes and socks. He continued pulling her hair to force her to comply with his wishes. After the oral sex, Brodniak forced her

- 3 -

between the seats and forced sexual intercourse, both vaginal and anal. Brodniak then opened her door, shoved her head out, and began choking her. Brodniak told her he was going to kill her, and also threatened her mother. He then forced her to have oral sex and intercourse with him again. Afterwards he "snapped out of things" and told her to get dressed. Brodniak then drove her to a corner near Green's house, where she had asked to be dropped off. When she arrived at Green's house Preston told her what happened, left the house hysterical and was walking down the street when Green caught up with her. Green eventually took Preston to her own home where Preston lived with her mother. Preston's mother then took her to the hospital.

Brodniak's version of the facts varies considerably. Brodniak testified that they left the university parking lot because Preston had to go to the bathroom and that she suggested that they go to "some wooded area where nobody would see her." Brodniak testified that he then drove to Pattee Canyon, parked his car, and helped Preston out. Preston then walked down into a borrow pit, stood in the water, and urinated. Other witnesses who saw Preston that morning testified she was not wearing her shoes because they were wet. It was Preston's contention that Brodniak never let her out of the car and that her shoes were wet because she spilled a beer on them. Brodniak maintained that they went to the campground in Pattee Canyon, parked and started necking. Brodniak further testified that they proceeded to engage in consensual sexual acts. He, however, also testified that toward the end of the sexual encounter, he became violent, pulling Preston's hair and choking her. He

testified that very soon after his outburst he took Preston home.

At the hospital, Preston was examined by Dr. Joseph Wyatt, who testified as to her physical condition. Wyatt testified that Preston was experiencing vaginal soreness; she had blood on her underclothes and around her vagina; she had a scratch on her chest; she had blood inside her vagina; and she had an inch-long, bleeding tear at the edge of her anus. Dr. Wyatt stated that Preston's physical condition was "probably not common" as a result of consensual intercourse.

While at the hospital, Preston was interviewed by Deputy Phillip Tilman. He retrieved for evidence the clothes Preston was wearing and a large ball of hair hanging from her head. The nurse that attended Preston at the hospital testified that a "gross amount" of Preston's hair came out when she combed her hair and that her scalp appeared to be tender while she was combing her hair.

During the police investigation, Brodniak's car was searched, and the investigators found several of Preston's hairs in the front seat and one of her earrings on the floor of the backseat. This evidence was examined at the State Crime Lab. Arnold Melnikoff, Bureau Chief of the Crime Lab, testified that the long hairs in the car belonged to Preston and that most of those hairs and the hair in the large ball had been pulled from her head with painful force.

Dr. Herman Walters, a psychologist, examined Preston at the State's request to determine her psychological condition and to recommend treatment. After interviewing Preston several times, Walters concluded that Preston's psychological condition was consistent with all the symptoms of the post traumatic stress disorder known as rape trauma syndrome.

As a result of the above events, Brodniak was charged with sexual intercourse without consent. Trial was held in the District Court and the jury returned a verdict against Brodniak, finding him guilty of the charge of sexual intercourse without consent. Subsequently, Brodniak was sentenced to 20 years in the Montana State Prison.

Brodniak raises six issues on appeal:

1. Whether the State's "expert" testimony concerning rape trauma syndrome, and other matters, should have been excluded;

2. Whether the District Court erroneously refused certain defense instructions crucial to his theory of the case;

3. Whether the District Court committed error in the verdict form it submitted to the jury;

4. Whether all testimony pertaining to Brodniak's confession should have been suppressed under the best evidence rule, and because of the destruction of field notes relating to it;

5. Whether the District Court's inconsistent rulings, and refusal to rule, on major evidentiary issues, deprived defendant of a fair trial; and

6. Whether the District Court's rulings concerning voir dire prejudiced Brodniak's right to the effective assistance of counsel.

A. Rape Trauma Syndrome

We will first address the admissibility of expert testimony concerning rape trauma syndrome (RTS). Brodniak attacks the admission of RTS testimony on numerous grounds only one of which we find persuasive. Specifically, Brodniak

contends that certain portions of Walter's testimony was an improper comment on the credibility of the victim.

Before addressing Brodniak's contention on its merits, we believe an overview of RTS testimony is necessary. In State v. Liddell (Mont. 1984), 685 P.2d 918, 923, 41 St.Rep. 1293, 1298-99, this Court held that RTS was a proper subject for expert testimony in a sexual intercourse without consent case. Where all that is disputed is the consent element such evidence is relevant to the question of whether there was consent to engage in a sexual act which all parties agreed occurred.

It is true several courts have refused to allow expert testimony on RTS. See State v. Stafford (N.C. 1985), 334 S.E.2d 799; Allewalt v. State (Md. 1985), 487 A.2d 664; People v. Bledsoe (Cal. 1984), 681 P.2d 291; State v. Taylor (Mo. 1984), 663 S.W.2d 235; State v. McGee (Minn. 1982), 324 N.W.2d 232; State v. Saldana (Minn. 1982), 324 N.W.2d 227. The reasons for disallowance vary. One common thread running throughout all such cases, however, is the purpose for which RTS testimony was offered. In all of the above cases, the experts testified that the victim suffered from RTS and therefore concluded expressly or implicitly, in their opinion, that the victim had been raped. Such testimony obviously goes far beyond that approved in Liddell. Such RTS testimony is generally considered an improper comment on the credibility of the victim.

In Bledsoe, supra, the California Supreme Court held that expert testimony that a complaining witness suffered from RTS was not admissible to prove that the witness was raped. In People v. Roscoe (1985), 215 Cal.Rep. 45, 49, however, the same court held that although expert testimony

- 7 -

regarding RTS is not admissible to prove that a rape occurred or to establish the defendant's guilt, it is admissible for other purposes. See also State v. Ogle (Mo. 1984), 688 S.W.2d 138, similarly distinguishing Taylor, supra. Our decision in Liddell is consistent with Roscoe and Ogle.

In the following cases the courts held either expressly or implicitly that a qualified expert may explain RTS to the jury and express an opinion that the victim suffers from the syndrome, but may not testify otherwise as to the credibility or believability of the complaining witness. State v. Lash (Kan. 1985), 699 P.2d 49; State v. Bressman (Kan. 1984), 689 P.2d 901; People v. Reid (1984), 475 N.Y.S.2d 741; State v. Middleton (Or. 1983), 657 P.2d 1215; People v. Izzo (Mich. 1979), 282 N.W.2d 10.

In Liddell, supra, this Court followed the reasoning of the Kansas Supreme Court in State v. Marks (Kan. 1982), 647 P.2d 1292, wherein that court held that when consent is the defense in a prosecution for rape, qualified expert psychiatric testimony regarding the existence of RTS is relevant and admissible. In a later Kansas case, Bressman, supra, the RTS expert testified that in her opinion the complainant had been raped. 689 P.2d at 907. The Kansas court held that the trial court erred in admitting this testimony reasoning that:

> 'An expert's opinion in a proper case is admissible up to the point where an expression of opinion would require him to pass upon the credibility of witnesses or the weight of disputed evidence.'

689 P.2d at 907. In Lash, supra, the expert was asked to give his opinion as to whether the victim in a child molestation case was telling the truth. 699 P.2d at 51. Citing its Bressman decision, the Kansas court held that such

an expression of opinion was improper, since such an opinion would require the expert to pass upon the credibility of witnesses or the weight of disputed evidence.

In Reid, supra, the New York Court sustained a pretrial motion to allow expert testimony describing RTS in rebuttal to an anticipated defense that the victim recanted the charges in a letter to the defendant. 475 N.Y.S.2d at 741. Regarding the issue faced by the Kansas Supreme Court in Lash and Bressman, supra, and this Court in the instant case, the court held:

> The admission of this [RTS] expert testimony is no more inflammatory, nor more intrusive into the province of the jury than other expert testimony, assuming adequate and proper instructions are provided to the jury, and, of course, the expert will not be permitted to testify as to whether she believes the witness (citations omitted), but rather, will be permitted to explain rape trauma syndrome to the jury and express her opinion that the victim suffers from that syndrome. The jury will then consider the credibility of the victim's testimony along with whatever evidence is submitted on the question of credibility. (Emphasis added.)

475 N.Y.S.2d at 743.

In at least two other jurisdictions, courts have stated the same rule--that is that an expert witness may not give an opinion on whether he believes the victim's story or whether he believes the witness is telling the truth. Middleton, 657 P.2d at 1221; Izzo, 282 N.W.2d at 11.

At the trial of this case, Walters testified in detail on the subject of RTS. Although Walters' testimony regarding RTS, itself, was not objected to, certain other portions of his testimony were objected to as improper comment on the credibility of the victim.

The pertinent portions of Walters' testimony are as follows:

- 9 -

Q. Dr. Walters, as part of your professional life, do you keep current on the literature and current on the research dealing with the area of sexual assault and rape? A. I attempt to do so, yes.

Q. What does that mean? What do you do to try to keep current? A. I try to keep track of what are the current books and research articles that are coming out and avail myself of various computerized services or summaries of general findings and do participate in some research in those areas.

Q. Dr. Walters, in the literature is there an area of literature that deals with sexual assault and rape? A. Yes.

Q. Does that particular literature contain any information regarding the frequency of false reports in sexual assault or rape cases? A. Yes.

Q. What is that frequency? A. In general, that the number of actual false accusations is approximately the same as for other kinds of crimes, roughly two percent of the number of accusations are found to be unfounded. Where it is not possible to proceed with an investigation because of various problems, that runs, depending on the study you read, somewhere around 17 to 25 percent.

Q. Dr. Walters, is that particular report in the literature consistent with your personal clinical experience? A. Yes.

Q. In the course of your professional career, have you been in the practice of making diagnoses of individuals or clients that have been referred to you? A. Yes, that is a routine part of my practice.

Q. Is part of the routine part of the practice for you to check for what we might call a malingerer? A. Yes.

Q. Could you explain what malingering is? A. The term refers to people who clearly distort information with the intention of creating a particular purpose that would be in some way to their advantage.

Q. Why is it important to check in your work to see if that process is going on? A. Because it can be a significant flaw in the conclusion you reach.

Q. The diagnosis you are seeking? A. Yes.

Q. Do you find malingering in persons who are complaining of sexual assaults? A. Occasionally.

Q. Again, in what frequency? A. Roughly two to three percent, depending a lot on where the work is going on, the kinds of motives people have. It is probably less in clinical practice where people are coming in just to help themselves than in a practice where they might have some fairly obvious motives about getting to move to another part of the prison or to get out or something of this kind.

. . .

Q. You indicated that you gave Debbie some tests, what kind of tests did you administer to her? A. An individual intelligence test, the Wexler Adult Intelligence Scale Revised. I gave her a perception test, the Minnesota Multiphasic Personality Inventory.

Q. Have you scored the individual intelligence test? A. Yes.

Q. What are your findings as far as Debbie's I.Q.? A. She had a verbal I.Q. of 78, a performance I.Q. of 72, full scale I.Q. of 78, which places her in the lowest 10 percent of the general population.

Q. Could you tell us a little bit about what kind of tasks and skills an individual with an I.Q. of 78 is likely to possess? A. Yes, an individual in that score range doesn't quite qualify for special ed in the public school system, yet they are very unlikely to be able to compete in regular grade level placement. Such an individual might be able to get through about an eighth grade education. They are very unlikely to succeed in regular school placement. They are likely to end up in an unskilled kind of work, often requiring fairly close supervision of kind of routine tasks. They are unlikely to be successful in kinds of work or kinds of activities that involve much academic learning.

Q. In connection with that kind of assessment, what would be her ability to be able to recount experiences and remember kinds of things that happened to her?

MR. BOGGS: Objection.

THE COURT: Overruled.

A. Limited.

Q. (By Ms. Townsend) Can you explain what you mean by that? A. An individual in this I.Q. range is likely to have difficulty following complex, rapid changes in sequences of events. They might be able to remember fairly vivid details out of events that attracted their attention. Their memory would not be very dependable.

. . .

Q. Doctor, how does the experience of something as traumatic as, say, a sexual assault, affect the individual's ability to recount the details of the event at some later date? A. To the extent that they are intensely frightened, and frightened that there might be other kinds of circumstances that compromise judgment, the reaction is it is typically very difficult for people to give highly detailed and accurate accounts;of what happens to them.

Q. If you combine that sort of a stress and the stress of a situation with someone with the I.Q. of, say, 78, how is that going to affect an individual's ability to recount later on, events of what went on and be precise about what happened when, et cetera? A. I would expect the accuracy of details, the sequence of details, to be relatively poor.

Q. Why is that? A. Because they simply can't absorb or process and retain that much information, which is to say that circumstances beyond a certain point of stress greatly interferes with memory.

Q. Does that mean when an individual recounts something one way that they are deliberately not recounting it correctly? A. Not necessarily.

Q. What does it mean? A. Their memory is not good.

Q. What about the period of time--the elapsed time period in a sexual assault? A. It's usually poor.

Q. Why is that? A. Same reason I have just recounted.

Q. So the stress significantly affects your ability to accurately say about how much time something took place? A. Yes.

Q. Doctor, in your diagnosis of post traumatic stress syndrome for Debbie Preston, did you also consider the possibility that she might be malingering? A. Yes.

Q. How did you check for that? A. In such examinations, first of all, I go over the information that the person provides on subsequent interviews. I am looking for information from other sources, such as our witness investigative report and so on to see if this information was consistent with what the individual provides. I will provide them opportunities to exaggerate in a way that would be favorable to what might be their case or their interest, and observe the extent to which they would do it. There are a variety of

techniques of this sort to give you some idea about the veracity.

Q. Did you do that in connection with Debbie Preston? A. Yes.

Q. What were your findings? A. I did not find any instances where she behaved in a way that would suggest to me that she is malingering.

It is well settled in Montana that the determination of the credibility of witnesses and the weight to be given their testimony is solely within the province of the jury. State v. Maxwell (1982), 197 Mont. 498, 647 P.2d 348; State v. Beachman (Mont. 1980), 616 P.2d 337, 37 St.Rep. 1558; State v. Harvey (1979), 184 Mont. 423, 603 P.2d 661; State v. Azure (1979), 181 Mont. 47, 591 P.2d 1125; State v. Lewis (1976), 169 Mont. 290, 546 P.2d 518. Clearly, Walters' testimony with regard to malingering and the statistical percentage of false accusations was improper comment on the credibility of Preston in light of the above cited authority and should not have been admitted in this case.

This Court, however, will not reverse a judgment of conviction for harmless error, and the question as to whether a particular error is harmful or harmless depends on the facts of the case under review. State v. Straight (1959), 136 Mont. 255, 265, 347 P.2d 482, 488. In the instant case we hold that the admission of Walters' testimony, above quoted, was harmless error. A review of the record of this case reveals that the physical evidence against Brodniak and his own admissions that he resorted to violence were so overwhelming that admission of the RTS testimony did not affect his substantial rights.

B. Jury Instructions

Brodniak next contends that the District Court improperly excluded his proposed instruction nos. 11, 12, 14 and 10c.

Brodniak's proposed instruction no. 14 addressed itself to the necessity that the force or lack of consent precede the acts of sexual intercourse for rape to occur. The instruction provided:

> The evidence in this case has raised the issue of the relationship in time between admitted acts of sexual intercourse, consent or lack of consent, and admitted forceful acts of defendant against the complaining witness.
>
> You are instructed that the force, or threat of force, necessary to show lack of consent on the part of Debbie Preston to acts of sexual intercourse with the defendant James Brodniak must precede the acts of sexual intercourse in time. If, from your consideration of all the evidence presented in this case, you find yourselves with a reasonable doubt whether any acts of force, or threat of force, on the part of James Brodniak preceded Debbie Preston's consent to sexual acts with James Brodniak, then you must return a verdict of not guilty to the charge of sexual intercourse without consent in this case.
>
> If you find yourself with this reasonable doubt, you are still required and authorized to consider whether or not the defendant committed the lesser included offense of assault upon Debbie Preston, as defined in these instructions.

The District Court refused Brodniak's proposed instruction no. 14 because the elements of the offense were adequately covered in other instructions. It is clear that instruction nos. 11 through 14 and 23, given to the jury, thoroughly instructed them on the elements of sexual intercourse without consent, and the effect of force on the element of consent. The jury was further instructed on the lesser offense of assault in instruction nos. 20 through 22. The District Court may properly refuse an instruction when the elements of the offense are adequately set forth in other

- 14 -

instructions. State v. Campbell (1972), 160 Mont. 111, 116, 500 P.2d 801, 804.

The State also contends that instruction no. 14 was properly refused because it is a misstatement of the law. The instruction requires a finding of use of force that precedes the acts. Because the victim suffered more than one act that could constitute sexual intercourse without consent, the instruction could erroneously mislead the jury to conclude that force could not begin after one act and before a second.

Brodniak also contends that his proposed instruction no. 12 was improperly denied. The instruction provided:

> You are instructed that, once a person consents to acts of sexual intercourse with another person, that consent may not, in contemplation of law, be withdrawn during the acts.
>
> Therefore, if you find from the evidence that Debbie Preston consented to have sex with James Brodniak, and, in the course of doing so, at some time withdrew her consent or may have withdrawn her consent, you may not find the defendant guilty of the offense of sexual intercourse without consent.

Brodniak's "withdrawal of consent" instruction is based on State v. Way (N.C. 1979), 254 S.E.2d 760. Way is much more limited in scope than the offered instruction. In Way, the court held that when there is only one act of intercourse, the victim cannot withdraw consent during the act and then charge the assailant with rape. Way, 254 S.E.2d at 761. Even if Way were the law in this state, the proposed instruction would still be unusable because it instructs the jury that "once a person consents to acts of sexual intercourse . . . consent may not . . . be withdrawn during the acts." Thus, the jury could be led to believe that once the woman consents, she can never withdraw her consent. This ignores the fact that under Montana's definition of sexual

intercourse without consent, Preston was raped not once, but several times. Section 45-5-503, MCA. Brodniak's proposed instruction no. 12 was properly denied as a misstatement of Montana law and because it does not comport with the law upon which the instruction was based.

Brodniak next contends his proposed instruction no. 10c was improperly denied. The instruction provides:

> You are instructed that the consent of Debbie Preston to the acts of James M. Brodniak is a defense to the charge of sexual intercourse without consent.

> Such consent is not a defense, however, if it was induced for force or by a threat of imminent death, bodily injury, or kidnapping, to be inflicted upon anyone.

> You are further instructed that the mere fact that Debbie Preston may have felt some uneasiness or fear in the presence of Defendant at some point, does not mean she was induced to give her consent by force or duress. Only if she was reasonable in thinking that the Defendant might use injurious force against her if she did not consent, was her consent induced by force. Whether she was reasonable in thinking this must be determined in light of all the circumstances surrounding the Defendant's acts, as brought out in the evidence put before you here.

> You are further instructed that a person may manifest their consent to a particular course of conduct by inaction as well as by positive affirmation. Inaction or sufferance may constitute consent when, in the natural course of human affairs, reasonable people would normally regard inaction in particular circumstances to mean that a person consented to the action taking place.

Brodniak's instruction no. 10c attempted to set forth the law that consent is a defense to a charge of sexual intercourse without consent as provided in § 45-2-211, MCA. Brodniak, however, never offered an instruction setting forth the statute. Rather, his instruction is a long, erroneous, and confusing interpretation of it. Further, the element of lack of consent was adequately covered in instruction no. 23 which was given. Moreover, the third paragraph of the instruction

- 16 -

attempts to bring Preston's state of mind into issue which has no place in the elements of the offense.

Brodniak last contends that his proposed instruction no. 11 was improperly denied. The instruction provides:

> You are instructed that resistance, or lack of resistance, on the part of Debbie Preston to the acts of James M. Brodniak may be considered by you in determining whether or not an act of sexual intercourse, if one took place, occurred "without consent."

> You are further instructed that it is the law of this state that a woman placed in circumstances where she feels sexual intercourse is about to occur with her is not required to resist by all violent means within her power. The law requires only that she does not consent, and that she do all that her age, strength and the attendant circumstances make it reasonable for her to do in order to manifest her opposition. She is not required to resist beyond exhaustion of her strength or beyond the point where the force used against her would make further resistance useless or impossible.

> You are also instructed that continuous resistance is not required to show that sexual intercourse was without consent.

Although Brodniak's proposed instruction no. 11 is a proper statement of the law, it was redundant when viewed with instruction no. 14 given by the court and was therefore properly refused. State v. Sanderson (Mont. 1985), 692 P.2d 479, 486, 42 St.Rep. 94, 102.

The instructions given by the District Court adequately covered every issue and theory having support in evidence, sexual intercourse without consent and assault. State v. Azure (1977), 175 Mont. 189, 194, 573 P.2d 179, 182. The instructions given accurately stated the applicable law.

C. Verdict Form

Brodniak here contends that the verdict form offered by the State and utilized by the District Court, invited the jury to consider punishment in its determination of guilt or

innocence in contravention of Montana law due to the inclusion of the grade of offenses, felony and misdemeanor, in the verdict form. The verdict form given to the jury stated:

## VERDICT

To the charge of Sexual Intercourse Without Consent, a Felony, we the jury, all of our number, find the defendant JAMES M. BRODNIAK

_____Guilty                    _____Not Guilty

Having found the Defendant not guilty of the offense charged of Sexual Intercourse Without Consent, a Felony, to the lesser included offense of Assault, a Misdemeanor, we the jury, all of our number, find the defendant JAMES M. BRODNIAK

_____Guilty                    _____Not Guilty

In State v. Herrera (1982), 197 Mont. 462, 467, 643 P.2d 588, 591, this Court stated:

[3] Under section 46-18-103, MCA, all sentences shall be imposed exclusively by the judge of the court. Because of that statute, we held in State v. Zuidema (1971), 157 Mont. at 367, 373, 374, 485 P.2d 952, 955, that punishment is not the concern of the jury whose sole function is to determine guilt or innocence. Instructing the jury as to various possibilities of sentence, we said (157 Mont. at 374, 485 P.2d at 956), impermissibly suggests to a jury that it should give weight to the possible punishment in reaching a verdict. In State v. French (1975), 166 Mont. 196, 205, 531 P.2d 373, 378, we held a court was not required to instruct the jury, where mental disease or defect excluding responsibility was an issue, that a person acquitted by reason of mental disease must be committed to the state hospital. In State v. Coleman (1978), 177 Mont. 1, 33, 34, 579 P.2d 732, 751, we upheld an instruction that sentencing was vested in the court and the jury was not to consider the possible punishment defendant could receive upon a verdict of guilty. The District Court in this case avoided prejudicial error by refusing the offered instruction in this case.

The issue before the Court then is whether the inclusion of the terms misdemeanor and felony suggested to the jury that it should give weight to the possible punishment in reaching their verdict. Clearly, inclusion of the terms in the

verdict form permitted the jury to indirectly consider the punishment of Brodniak. But again, based on the facts of this case, we find that any prejudice caused by inclusion of the terms in the verdict, even though they convicted Brodniak of the felony, sexual intercourse without consent, was harmless.

Brodniak also contends that the District Court erred by not utilizing his special interrogatories to the verdict form. The special interrogatories stated:

VERDICT: SPECIAL INTERROGATORIES

If, from your consideration of the evidence, you find the Defendant guilty of sexual intercourse without consent, then indicate the basis of your verdict as follows:

[ ] 1. The Defendant, before the inception of sexual acts or intercourse, induced Debbie Preston's consent to the same, by force or threat of force.

[ ] 2. Although Debbie Preston was a voluntary social companion of Defendant and consented to have sex with him, at some point during acts of intercourse she withdrew her consent, and he used force or threat of force to perpetrate further acts.

Brodniak offered the interrogatories as a means of determining for appeal whether the jury verdict was based on a theory of withdrawn consent, as opposed to force or lack of consent from the inception. Brodniak relies on two cases for his contention that the special interrogatories should have been given to the jury. People v. Horton (Colo. 1984), 683 P.2d 358; State v. Cunningham (Wash. 1979), 598 P.2d 756. These cases, however, merely hold that all theories charged should be submitted to the jury for a special verdict. In the instant case all the theories charged were reflected in the verdict form given the jury.

Brodniak's argument that the District Court erred by not giving the special interrogatories is not persuasive. The fact of the matter is that the jury determined from the evidence that Brodniak committed the offense of sexual intercourse without consent against Preston. Whether the jury believed that the element of without consent existed at the inception of the sexual acts or whether at some point Preston withdrew her consent and then Brodniak engaged in further acts of sexual intercourse without consent is unimportant. The important point is that the jury found that at some point Brodniak committed sexual intercourse without consent. A plain reading of § 45-5-503, MCA, indicates that Preston could have been raped as many as five or six times. All that was necessary was that the jury find she was raped once. The District Court properly denied Brodniak's special interrogatories.

D. Best Evidence Rule

Shortly after Brodniak's arrest, sheriff's deputy Steven Gunderson conducted a tape-recorded interview with Brodniak's consent. During the interview he took notes of Brodniak's statements. The tape itself was recycled before trial because Gunderson mistakenly thought that Brodniak had given another statement to another officer. The recording, however, had been transcribed prior to its being recycled. Two days after the taped interview, Gunderson prepared a formal report using his notes and his memory. Gunderson testified he never reviewed the tape with the transcript. He, however, did review his report and testified that it accurately stated what Brodniak said during the interview. During trial Gunderson testified using his report to refresh

his memory. During his examination, Gunderson also twice read from the transcript.

Brodniak contends that the statements from the transcript should not have been used at trial because of the best evidence rule. The best evidence rule is Rule 1002, M.R.Evid. and provides:

> To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided by statute, these rules, or other rules applicable in the courts of this state.

Brodniak relies on State v. Warwick (1972), 158 Mont. 531, 494 P.2d 627, to support his contention that the District Court committed reversible error by allowing Gunderson to read from the transcript of the recording. In Warwick, this Court stated:

> There are some cases where only the transcription of the recording has been offered and though objected to on the basis that the transcription is not the best evidence, courts have admitted the transcription where a proper foundation was laid for the admission. (Citations omitted.)

> However, in State v. Baca, 82 N.M. 144, 477 P.2d 320, a police officer's notes that had been transcribed from a tape recorded interview between the defendant and the informer were held inadmissible, due to failure to lay a proper foundation for both the recording itself and the subsequent transcription. That is precisely the factual situation here, except under our factual situation the tape is missing or destroyed. This loss or destruction of the tape or record has, in the few cases we have found from other jurisdictions, raised the best evidence rule objection, and where admission has been allowed it has only been after the prosecution has proven the authenticity of the transcription--that is, after laying the proper foundation as to the accuracy of the secondary evidence following the guidelines set forth in 58 A.L.R.2d 1024, heretofore quoted.

Warwick, 158 Mont. at 543-44, 494 P.2d at 633. Based on Warwick, the State should have strictly adhered to the following foundation to authenticate the recording and the transcript thereof:

".  .  .

> (1) a showing that the recording device was
> capable of taking testimony, (2) a showing that the
> operator of the device was competent, (3)
> establishment of authenticity and correctness of
> the recording, (4) a showing that changes,
> additions, or deletions have not been made, (5) a
> showing of the manner of preservation of the
> recording, (6) identification of the speakers, (7)
> a showing that the testimony elicited was
> voluntarily made without any kind of inducement."

Warwick, 158 Mont. at 542-43, 494 P.2d at 633.

In the instant case, because the recording was destroyed and because Gunderson "did not review the transcript" or compare it with the recording, the only testimony offered to prove the authenticity and correctness of the recording was Gunderson's testimony that he knew it was accurate based on his recollections and his formal report. A review of the transcript in this case, indicates that there was not "strict adherence" to the Warwick foundation and the District Court therefore erred by allowing Brodniak's statement to Gunderson to be read from the transcript.

The question then becomes whether the error prejudiced Brodniak. It is the duty of this Court to ascertain whether or not errors made at trial are prejudicial, for only upon such prejudicial errors may a case be returned to the District Court for retrial. Warwick, 158 Mont. at 539, 494 P.2d at 631; State v. Totterdell (1959), 135 Mont. 56, 60, 336 P.2d 696, 698. Gunderson read two statements from the transcript of the recording. These statements, however, were consistent with Brodniak's own testimony. Brodniak was therefore not prejudiced by the admission of the statements.

Brodniak also contends that all testimony pertaining to his statements to Gunderson should not have been admitted because the State negligently suppressed the tape and

Gunderson's notes taken during the interview. The law in Montana regarding suppression of evidence is that negligent suppression will overturn a conviction if prejudice can be shown by the suppression. State v. Craig (1976), 169 Mont. 150, 153, 545 P.2d 649, 651. Again, Brodniak makes no showing that he was prejudiced by the negligent suppression of the recording or Gunderson's field notes.

E.  <u>Evidentiary</u> <u>Rulings</u> <u>of</u> <u>the</u> <u>District</u> <u>Court</u>

Brodniak contends that the District Court's postponement of rulings of various evidentiary motions prejudiced his case. Specifically, Brodniak first contends that the District Court made arbitrary and inconsistent rulings with regard to the admission of the transcript of the tape recording that led to confusion and deprived Brodniak of a fair trial. Brodniak further contends that the District Court deprived him of a fair trial by postponing ruling on the admission of Dr. Walter's rape trauma testimony.

The record, however, shows the evidentiary matters on which the District Court reserved its ruling, depended on their relevancy at the time of introduction and the adequacy of their foundation. The trial court judge has a wide latitude of discretion in conducting courtroom procedures, and in determining adequacy of foundation for admission of evidence. State v. Austad (1982), 197 Mont. 70, 94, 641 P.2d 1373, 1386; State v. LaMere (Mont. 1980), 621 P.2d 462, 466, 37 St.Rep. 1936, 1941. There is no indication that the District Court did anything other than exercise its discretion in order to rule correctly on all evidentiary matters. The District Court acted correctly and Brodniak suffered no prejudice.

## F. District Courts Voir Dire Rulings

In the instant case, the District Court restricted the jury voir dire by prohibiting the attorneys from making references to their own personal experiences as a means of eliciting biases from prospective jurors. Brodniak contends that this ruling four days before trial, prejudiced his trial preparation. The State contends that by restricting the voir dire to exclude counsel's comments on their personal experience, the District Court acted within its discretion.

The purpose of voir dire in a criminal proceeding is to determine the existence of bias and prejudice on the part of prospective jurors and to enable counsel to intelligently exercise their pre-emptory challenges. State v. Stuit (1978), 176 Mont. 84, 87, 576 P.2d 264, 266. Any questioning conducted to establish rapport or to educate the jury is extraneous to the legitimate objects of voir dire. State ex rel. Stephens v. District Court (1976), 170 Mont. 22, 27, 550 P.2d 385, 388. Counsel for Brodniak admitted that the purpose of counsel making references to personal experiences was to establish rapport with potential jurors. This being true, the District Court acted properly in limiting matters "extraneous to the legitimate objects of voir dire" based on Stephens, supra.

We affirm.

_____
John C. Shelly
Justice

We Concur:

_____
Chief Justice

- 24 -

_L. C. Gulbrandson_

_John Conway Harrison_

_Fred J. Weber_

_William E. Hunt Sr._

_____
Justices

Mr. Justice Frank B. Morrison, Jr. dissents as follows:

I agree with the majority conclusion that Walters' testimony constituted a comment on the evidence and was impermissible. I disagree that such testimony constitutes harmless error.

The victim's testimony can be summarized as follows: (1) The victim wanted a ride home but did not want to have sex with defendant. (2) The victim was not "picked up" by the defendant in the bar. (3) The victim was, for all practical purposes, a prisoner in the defendant's car at the time it was parked in the Pattee Canyon area.

The chief witness for the State was challenged, not only by the defendant, but by Diane Geddes, the victim's female companion at the bar. Directly contrary to the victim's testimony, Geddes testified that the victim told her she was going home with the defendant. It was her impression that the two were leaving to have sex.

Defendant testified that near the end of the sexual encounter he became violent toward the complainant and that he pulled her hair and choked her. He testified that the sex was very aggressive and that, at one point he mistakenly penetrated the victim's anus. The defendant's testimony is as much corroborated by the physical facts as is that of the complaining witness.

I am unable to say that the evidence of guilt is so overwhelming that the credibility of the complaining witness did not come into play. Dr. Walters' testimony, bolstering that of the victim, could well have influenced the jury. Under these circumstances, we should reverse and remand for a new trial.

I also feel that the trial bench and bar will be somewhat confused by the majority's position. Apparently the

26

rational of <u>Liddell</u> is approved. The majority seems to confine admissibility of rape trauma syndrome testimony to those instances where medical personnel, having observed demeanor shortly following the alleged incident, testifies that such demeanor is compatible with a significant traumatic incident such as rape. The expert will not be allowed to comment on the credibility of the complaining witness. Whether this rule will be capable of practical application remains to be seen.

I would reverse and remand for a new trial.

_____
Justice