FILED

08/11/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 18-0342

DA 18-0342

IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 201

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

PHILIP BRYSON GRIMSHAW,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. ADC 16-701
Honorable Deborah Kim Christopher, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Alexander H. Pyle, Assistant Appellate Defender, Helena, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, Brad Fjeldheim, Assistant Attorney General, Helena, Montana

          Joshua A. Racki, Cascade County Attorney, Ryan Ball, Stephanie Fuller, Cascade County Deputy Attorneys, Great Falls, Montana

Submitted on Briefs:  June 3, 2020

Decided:  August 11, 2020

Filed:

_____
Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 Defendant and Appellant Philip Bryson Grimshaw (Grimshaw) appeals the Judgment issued by the Eighth Judicial District Court, Cascade County, on April 18, 2018, following his conviction of Sexual Intercourse Without Consent, a felony, in violation of § 45-5-503, MCA.

¶2 We address the following restated issue on appeal:

*Whether the District Court abused its discretion and compromised Grimshaw's right to a fair trial by allowing expert witness testimony regarding statistics about false reports of sexual assault.*

¶3 We reverse and remand for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 Grimshaw is step-cousins with T.G. The two are around the same age and were close friends, particularly in the years after Grimshaw's father died. Grimshaw developed romantic feelings for T.G., which he expressed to her. She informed Grimshaw they could not be together because they are cousins. The two remained close friends, however.

¶5 Shortly before midnight on November 10, 2016, T.G. got off work. She had been texting with Grimshaw throughout the day and went to Grimshaw's house in Great Falls around 1:00 a.m. on November 11, 2016, after Grimshaw texted her and asked if she wanted to "come party." T.G. went to the house and joined in playing drinking games with around seven or eight other people. After a while, T.G. heard yelling and glass break. She discovered Grimshaw in the bathroom with his hand bleeding because he had punched a picture on the wall. Grimshaw kicked everyone else out of the party and went for a drive with T.G. Grimshaw and T.G. took some alcoholic beverages from the house and drove to

2

the gravesite of Grimshaw's father, an activity they had done many times before. At the gravesite, the two sat on the grass and talked while drinking and smoking. They left the cemetery around 4:00 a.m. and continued to drive around while drinking and smoking marijuana. The two arrived at T.G.'s house around 6:00 a.m. on the morning of November 11.

¶6 After arriving at T.G.'s house, Grimshaw and T.G. briefly hung out on the couch before T.G. gave Grimshaw a pillow and blanket and went upstairs to go to bed. At 6:27 a.m., Grimshaw, who was still on the couch downstairs, texted T.G., "Goodnight beautiful." T.G. responded "Goodnight love ☺" before Grimshaw texted back, "Goodnight darlin can I come cuddle with you? I mean if it's not to [sic] much." T.G. testified she did not respond because she had already fallen asleep.

¶7 The parties disagree about what happened next; however, it is undisputed Grimshaw and T.G. had sex. At trial, T.G. testified the first thing she remembered upon waking up was Grimshaw pulling down her pants and penetrating her anus with his penis. T.G. told Grimshaw "no," before Grimshaw flipped her over and penetrated her vagina with his penis. T.G. testified she did not say anything after that because Grimshaw pinned her to the bed with his hand around her throat while he had sex with her. T.G. testified she blacked out for a moment and regained consciousness as Grimshaw grabbed the back of her head and put his penis in her mouth. T.G. immediately took Grimshaw's penis out of her mouth and the two said nothing to each other. Grimshaw then passed out. After Grimshaw passed out, T.G. gathered her clothes and went downstairs where she fell asleep

on the couch.  T.G. awoke to Grimshaw coming down the stairs.  Grimshaw said he was going outside to smoke a cigarette and left the house.

¶8      After he left, Grimshaw texted T.G. and the two had the following text message exchange:

> Grimshaw: I'm sorry about last night.  I love you darling.  I know you probably never want to talk to me after what happen.
>
> T.G.: It's ok, I love you to.  Where did you go?
>
> Grimshaw: I feel like i had to leave
>
> T.G.: Um ok.
>
> Grimshaw: So I started walking home
>
> T.G.: 👆
>
> Grimshaw: Do you hate me?
>
> T.G.: Did I say that?
>
> Grimshaw: Just making sure.
>
> T.G.: Fucked up though.
>
> Grimshaw: I feel ya
>
> T.G.: Yep.
>
> Grimshaw: I'm still hella drunk
>
> T.G.: Jeez
>
> Grimshaw: Yeah I love you.
>
> T.G.: I love ya to.

T.G. testified it was "[f]ucked up" both because they were cousins and because Grimshaw had raped her.

¶9 T.G. did not immediately report the rape. She testified she was scared, uneasy, and unsure what to do because Grimshaw was family and her best friend. On November 21, 2016, T.G. went to the hospital due to a migraine headache. While at the hospital, T.G. told her mother about the rape and was examined by a sexual assault nurse. At the hospital, T.G. told the nurse and a responding police officer what happened with Grimshaw on the morning of November 11. A few days later, T.G. was interviewed by Detective Noah Scott at the Great Falls Police Department where she told him the story of what happened on the morning of November 11.

¶10 Grimshaw's account of the events of November 11 differed from T.G.'s during an interview he gave to Detective Scott and Detective Adam Price of the Great Falls Police Department on November 28, 2016. Grimshaw first told the detectives he blacked out from drinking on the night of the incident and remembered little, but could have had sex with T.G. After Detective Scott showed Grimshaw pictures of the text conversation between Grimshaw and T.G., Grimshaw stated he apologized to T.G. after she told him they had sex, but he had no recollection of having sex with T.G. Grimshaw told the detectives "it might have been a little, kind of, rape deal." He told the detectives all he remembered was going up to cuddle with T.G. in her bed. He said she was awake but intoxicated. He said the next thing he remembered was waking up alone in T.G.'s bed, and he realized what happened because his clothes were scattered everywhere. Grimshaw said he went downstairs, woke T.G. up, apologized for having sex with her, and left.

5

¶11 When asked by the detectives what, looking back, he felt the incident was, Grimshaw responded "Rape. I mean . . . yeah, I did something that she didn't want, and I did it forcibly." After this statement, Grimshaw told the detectives he was going to be truthful and he did remember a lot of what happened that night. He said he remembered going upstairs to cuddle with T.G. in her bed, starting to feel her up, being felt up by T.G., and then having sex. Grimshaw said he thought T.G. wanted to have sex with him at the time and he did not forcibly remove her clothes or have sex with her while she was not awake. Grimshaw said he realized after the fact that T.G. did not want to have sex, as she had previously told him they "could never be anything, could never do anything" because they were cousins. Grimshaw was arrested at the end of this interview and charged with one count of sexual intercourse without consent.

¶12 Before the first trial setting, the State filed a Notice of Expert Witness and indicated Dr. Sheri Vanino would "testify as to the behavior(s) of rape victims, including but not limited to the actions of rape victims after being raped, such as delayed disclosures and continued contact with the perpetrator following the rape[.]" After receiving this notice, Grimshaw moved to continue the trial so he could find a rebuttal expert witness to testify at trial, which the District Court granted. Grimshaw thereafter filed a Notice of Rebuttal Expert Witness, indicating Dr. Bowman Smelko would "testify in rebuttal on the same topics as the State's expert[.]"

¶13 The matter went to trial in September 2017. Grimshaw contended at trial that the sex was consensual and T.G. falsely accused him of rape because she was ashamed about having sex with her cousin. After Detective Scott, sexual assault nurse Jessica Bray, T.G.,

6

and Angela Grimshaw testified, the State called Dr. Vanino. Dr. Vanino testified as a "blind expert"—testifying generally to behaviors exhibited by victims of sexual assault including delays in disclosure, not specifically to the facts of the present case. While testifying to these behaviors, Dr. Vanino stated one of the popular misconceptions was "that women tend to run around and falsely accuse people of rape, or cry rape all the time, which is really not supported. And so, most women don't report." Counsel for Grimshaw objected to Dr. Vanino "talking about statistics or what's common or what's not common on false reports," arguing such testimony was barred by *State v. Brodniak*, 221 Mont. 212, 718 P.2d 322 (1986). The District Court overruled Grimshaw's objection, finding that as long as Dr. Vanino's "comments are with regard to the myths, I'll allow the witness to testify."

¶14 Dr. Vanino continued testifying about the misconceptions surrounding false reports and then the State asked a question about what the research supports regarding delayed disclosures. Before answering the State's question, Dr. Vanino expressed she was confused about whether she was allowed to talk about statistics. Grimshaw reiterated his objection to testimony about statistics pursuant to *Brodniak* and M. R. Evid. 702. The District Court again overruled Grimshaw's objection, noting Grimshaw had a rebuttal expert and the issue would "come[] down to a battle of the experts[.]" Dr. Vanino then testified only 16 to 20 percent of sexual assault survivors ever tell anyone. On cross-examination, Dr. Vanino testified about 19 percent of sexual assault victims fight back and again that only 16 to 20 percent of victims report. On re-direct, the State asked Dr. Vanino about false reporting statistics. Dr. Vanino testified between "two and eight

7

percent of sexual assault cases end up to be false reporting," and noted false reports typically included details consistent with the other rape myths to which she had previously testified.

¶15 Grimshaw called Dr. Smelko as his rebuttal expert. Dr. Smelko acknowledged the validity of the statistics as presented by Dr. Vanino, but testified to the limited sample sizes of the studies and the difficulty in verifying false reporting statistics. Dr. Smelko testified "the [two to eight] percent, I think, is pretty recognized as the number if we're considering those who make false allegations."

¶16 During its closing argument, the State emphasized the statistical testimony of Dr. Vanino and Dr. Smelko, telling the jury "you heard from Dr. Vanino, and Dr. Smelko agreed, incidents of false reporting is two percent to eight percent. And it's usually from someone with something to gain or someone who's, as Dr. Vanino said, truly psychotic." After deliberation, the jury convicted Grimshaw of felony sexual intercourse without consent. The District Court sentenced him to 40 years at the Montana State Prison with 20 years suspended. Grimshaw appeals.

**STANDARD OF REVIEW**

¶17 We review a district court's ruling on the admissibility of expert testimony for an abuse of discretion. *State v. St. Germain*, 2007 MT 28, ¶ 14, 336 Mont. 17, 153 P.3d 591 (citations omitted). An abuse of discretion occurs when a district court acts arbitrarily or unreasonably, resulting in substantial injustice. *State v. Holland*, 2019 MT 128, ¶ 8, 396 Mont. 94, 443 P.3d 519 (citing *State v. Zimmerman*, 2018 MT 94, ¶ 13, 391 Mont. 210, 417 P.3d 289). "Although a district court possesses broad discretion to determine the

8

admissibility of evidence, judicial discretion must be guided by the Rules of Evidence, applicable statutes, and principles of law." *Zimmerman*, ¶ 13 (citing *Maier v. Wilson*, 2017 MT 316, ¶ 17, 390 Mont. 43, 409 P.3d 878).

**DISCUSSION**

¶18 *Whether the District Court abused its discretion and compromised Grimshaw's right to a fair trial by allowing expert testimony regarding statistics about false reports of sexual assault.*

¶19 On appeal, Grimshaw argues the expert testimony regarding the statistics around false reports of rape prejudiced his right to a fair trial by turning the case into a "trial by statistic," rather than one based on the specific facts of this case. The State argues the District Court, granted broad discretion to admit relevant expert witness testimony, did not abuse its discretion by admitting the statistical testimony. The State further argues that, even if the admission of such testimony was an abuse of discretion, its admission was ultimately harmless due to the significant admissible evidence that T.G. did not consent to sex with Grimshaw.

¶20 We begin by first analyzing whether the admission of the expert witness testimony as it relates to statistical rates of false reports of sexual assault was an abuse of discretion. We will find a district court to have abused its discretion when it "acts arbitrarily or unreasonably, resulting in substantial injustice." *Holland*, ¶ 8.

¶21 "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." M. R. Evid. 702. "It is well settled in Montana that the

9

determination of the credibility of witnesses and the weight to be given their testimony is solely within the province of the jury." *Brodniak*, 221 Mont. at 222, 718 P.2d at 329 (citations omitted). "An expert witness may not comment on the credibility of the victim's testimony." *Rogers v. State*, 2011 MT 105, ¶ 26, 360 Mont. 334, 253 P.3d 889 (citing *St. Germain*, ¶ 27).

¶22 The State presented the testimony of Dr. Vanino as a "blind expert" who would testify to rape myths and the behaviors of victims. For much of her testimony, this is what she did. Eventually, however, the State asked Dr. Vanino to get into the false reporting statistics. Dr. Vanino testified the statistics show between two and eight percent of sexual assault reports are false.

¶23 In *Brodniak*, we reviewed the testimony of a psychologist, called as an expert witness, who had examined the victim of a sexual assault to determine if she had symptoms consistent with rape trauma syndrome. During his testimony, the psychologist testified to both the statistical percentage of false rape allegations and to his opinion as to whether the victim was malingering. *Brodniak*, 221 Mont. at 219-222, 718 P.2d at 327-29. We held the psychologist's testimony "with regard to malingering and the statistical percentage of false accusations was improper comment on the credibility of" the witness. *Brodniak*, 221 Mont. at 222, 718 P.2d at 329.

¶24 While Dr. Vanino was testifying as a blind expert about rape myths and symptoms or behaviors common to victims of sexual assault and had not personally examined T.G., unlike the psychologist in *Brodniak*, we reach the same conclusion about her testimony regarding the statistics of false sexual assault reports as we did in that case. Presenting

testimony that only between two and eight percent of sexual assault reports are false clearly commented on, and improperly bolstered, the credibility of T.G.'s testimony. The clear inference of the statistical testimony in this case was that there is a 92-98% probability that Grimshaw was guilty of the charged offense such that T.G. was telling the truth as compared to a 2-8% probability T.G. had made a false accusation.

¶25 The State argues Dr. Vanino's testimony was similar to expert witness testimony on battered woman syndrome, which we noted "assists the jury in understanding the woman's *actions*" in *State v. Walker*, 2018 MT 312, ¶ 42, 394 Mont. 1, 433 P.3d 202 (emphasis added). Much of Dr. Vanino's testimony was indeed similar to this type of testimony— such as her testimony regarding common misconceptions surrounding rape and victim behavior. The statistical probability testimony at issue here, however, is not at all similar to expert testimony on battered woman syndrome and typical symptoms or behaviors exhibited by those suffering from the syndrome. Dr. Vanino testified that only between two and eight percent of sexual assault reports are false. This testimony, in essence, vouched for T.G.'s credibility in a case where T.G. claims she was sexually assaulted and Grimshaw claims her report is false. *See Walker*, ¶ 46. Such credibility-boosting expert testimony is improper.

¶26 The State further alleges Grimshaw was the one who opened the door to the introduction of statistical evidence by contending T.G. falsely accused him of rape and the State had a right to rebut this defense. "When one party opens the door, or broaches a certain topic that would otherwise be off limits, 'the opposing party has the right to offer

11

evidence in rebuttal . . . .'" *State v. Guill*, 2010 MT 69, ¶ 39, 355 Mont. 490, 228 P.3d 1152 (quoting *State v. Veis*, 1998 MT 162, ¶ 18, 289 Mont. 450, 962 P.2d 1153).

¶27    While the State certainly has a right to rebut a defendant's chosen defense, a defendant alleging he is innocent of a sexual crime does not open the door for the State to present statistical evidence that shows a defendant is between 92 and 98% likely to be guilty simply by virtue of being accused.   Such an interpretation would turn the presumption of innocence on its head for all sexual crimes.  Further, it was the State who elicited the statistical data from Dr. Vanino—not Grimshaw.   On cross-examination, Dr. Vanino responded to one of Grimshaw's counsel's questions by saying she was "happy to talk to you about the false reporting statistics if I'm allowed to get into that because that sounds like what you're asking about."  Grimshaw's counsel moved on and did not get into the false reporting statistics.  On rebuttal, the State pounced on defense counsel's avoidance of the false reporting statistics, commenting Grimshaw "didn't really want to get into" these statistics—insinuating Grimshaw was attempting to hide evidence from the jury—and then directly asked Dr. Vanino "what are those false reporting statistics?"  It was only then that Dr. Vanino testified to the two to eight percent false reporting statistic. Grimshaw's questioning did not open the door for the State to present this improper statistical evidence.  This evidence was not put on to inform the jury on symptoms or behaviors of sexual assault victims to better understand T.G.'s behaviors, but rather for the sole purpose of bolstering T.G.'s credibility.

¶28    Because we find Dr. Vanino's testimony about the rate of false reports of sexual assault was improper and Grimshaw did not open the door to such testimony, we hold the

12

District Court abused its discretion in admitting such testimony. The District Court, which had admittedly not read *Brodniak* when it ruled on Grimshaw's objection, ignored the mandates of *Brodniak* when it admitted Dr. Vanino's testimony regarding statistics. The District Court acted arbitrarily and unreasonably by admitting Dr. Vanino's testimony over Grimshaw's objection. *Holland*, ¶ 8.

¶29 Finding the District Court abused its discretion in admitting the statistical testimony, we now turn to whether Grimshaw's right to a fair trial was violated. Because the error in this case was the improper admission of evidence, it was "trial error." *State v. Van Kirk*, 2001 MT 184, ¶ 40, 306 Mont. 215, 32 P.3d 735. Trial error is neither presumptively prejudicial nor automatically reversible. *Van Kirk*, ¶ 40. As we noted in *Brodniak*, we "will not reverse a judgment of conviction for harmless error, and the question as to whether a particular error is harmful or harmless depends on the facts of the case under review." *Brodniak*, 221 Mont. at 222-23, 718 P.2d at 329 (citing *State v. Straight*, 136 Mont. 255, 265, 347 P.2d 482, 488 (1959)). In order to prove trial error was harmless, the State "must demonstrate that there is no reasonable possibility that the inadmissible evidence might have contributed to the conviction." *Van Kirk*, ¶ 47.

¶30 The State argues the statistical testimony, even if its admission was an abuse of discretion, was merely harmless trial error because it presented admissible evidence T.G. did not consent to sex with Grimshaw. It points to Grimshaw's interview with police, where he stated his encounter with T.G. "might have been a little, kind of, rape deal" and told them he "did something that she didn't want, and [he] did it forcibly" to support its argument the jury was going to convict Grimshaw regardless of the statistical evidence

13

presented. As both parties agree they had sex, the only issue at trial was whether T.G. consented.

¶31 At trial, T.G. testified she did not consent. Grimshaw argued she did consent, and falsely accused him of rape because she was ashamed of having sex with her cousin. Grimshaw argued his statements to police in the recorded interview were essentially that of a confused man attempting to explain having sex with his cousin to the police. The jury was presented with the conflicting stories of both T.G. and Grimshaw and tasked with making a determination of who was telling the truth about what happened in the early morning hours of November 11, 2016.

¶32 The admission of the statistical evidence boosted T.G.'s credibility and ultimately tipped the scales to an unfair trial. While there was admissible evidence tending to prove Grimshaw's guilt, such evidence was not so strong there was "no reasonable possibility" the false reporting statistics could have contributed to his conviction. Dr. Vanino testified to a two to eight percent chance of a false report of a sexual assault. T.G. reported Grimshaw sexually assaulted her, and according to the statistical testimony presented at trial, it implied there is a 92-98% chance she was telling the truth about that sexual assault. In a case which turns on which party the jury believes, such numbers are impossible to ignore. Grimshaw is entitled to be tried on the merits of his own case, and the admission of the false reporting statistical evidence undermines our confidence that is what happened here. Accordingly, we hold Grimshaw's right to a fair trial was violated by the improper admission of the false reporting statistics.

¶33   This is ultimately a "he said-she said" consent case which turns solely on the credibility of the parties, one of the most difficult for our legal system to handle. In this case, the State's improper use of credibility-boosting statistical evidence compromised the integrity of Grimshaw's trial. Grimshaw is therefore entitled to a new trial.

**CONCLUSION**

¶34   The District Court abused its discretion when it allowed expert witness testimony on statistics regarding false claims of rape. The District Court's error violated Grimshaw's right to a fair trial and the proper remedy is a new trial.

¶35   Reversed and remanded for a new trial.

/S/ INGRID GUSTAFSON

We concur:

/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR

15