FILED

07/23/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0500

DA 21-0500

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2024 MT 153

CITY OF WHITEFISH,

      Plaintiff and Appellee,

    v.

JOSHUA ZUMWALT,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DC 21-193A
Honorable Amy Eddy, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Joshua James Thornton, Assistant
Appellate Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Christine Hutchison,
Assistant Attorney General, Helena, Montana

          Angela Jacobs, Whitefish City Attorney, Mary Barry, Deputy City
Attorney, Whitefish, Montana

Submitted on Briefs:  November 15, 2023

Decided:  July 23, 2024

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Joshua Thomas Zumwalt (Zumwalt) appeals the August 10, 2021 Order entered by the Eleventh Judicial District Court, Flathead County, affirming his conviction for driving under the influence (DUI) in violation of § 61-8-401, MCA. He challenges the Municipal Court's denial of his motion to suppress evidence obtained as a result of the search he contends was unlawful. The District Court affirmed the Municipal Court's denial of the motion. Alternatively, Zumwalt argues a new trial is necessary because the prosecution elicited expert opinion testimony without laying a proper foundation.

¶2 We restate the issues as follows:

1. *Whether the Municipal Court erred by denying Zumwalt's motion to suppress?*

2. *Whether the Municipal Court abused its discretion by allowing officers to give opinion testimony about Zumwalt's degree of intoxication relative to the alleged time he consumed alcohol and, if so, whether the error was harmless?*

¶3 We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 In the early morning hours of January 2, 2020, the Whitefish Police Department was alerted to a vehicle collision in the parking lot of an apartment complex in Whitefish, Montana. Dispatch conveyed to officers a citizen's report advising that a truck hit a parked vehicle, followed by the driver parking the truck, getting out, and staggering as he walked and entered one of the apartments. Officer Garner, Officer Stahlberg, and Sargeant Veneman responded to the call.

2

¶5     Officer Stahlberg arrived at the apartment complex and spoke with Clint Slosson, who had witnessed the incident and placed the call to police. Slosson reported that he believed the suspect truck had hit his girlfriend's car that was also parked in the lot, and that the driver, who was known to Slosson, had difficulty maintaining his balance but reached and entered his apartment, Unit 9 of the complex. Officer Stahlberg examined the subject truck, noting it had scratches on it, while Slosson's girlfriend's vehicle had sustained significant damage on the front passenger side. The truck was parked with its rear tires up on a sidewalk and front tires in the lot. Officer Stahlberg ran a check on the truck's license plate, which came back as registered to Zumwalt, and listed Unit 9 of the apartment complex as his address.

¶6     Officer Stahlberg began walking to Zumwalt's apartment and was joined by the other two officers. They followed a sidewalk along the parking lot that extended the length of the apartment complex, including Zumwalt's ground-level apartment. The sidewalk proceeded beyond his apartment and ended at the complex's laundry facility near the rear of the building. An open, grassy common area lay in the back of the building, including along the backside of Zumwalt's apartment. His apartment had a window that looked out into the grassy area, and was positioned roughly sixty feet away from the end of the sidewalk.

¶7     The officers initially approached Zumwalt's front door, and Officer Garner knocked. No one answered. Officer Stahlberg then approached to about ten feet away from the front side of the apartment and looked toward a window, reporting that he thought

3

he saw a shadow moving through the blinds. He later testified he thought it was a person who was standing right by the front door of the apartment. Officer Stahlberg and then Sargeant Veneman subsequently walked around to the back of the apartment for purposes of ensuring no one would attempt to leave the building. There were no posted signs in the common area indicating an intended use of the area, or any fences or barriers segmenting the open space among apartments. Sargeant Veneman looked in a window of Zumwalt's apartment from about two feet away and could see through partially-drawn blinds that a person was inside the apartment and standing right by the front door. This information was relayed to Officer Stahlberg and Officer Garner.

¶8     Officer Garner continued to knock on the front door and stated that they were police officers. On his return to the front of the building, Officer Stahlberg observed again what he believed was a shadow passing by the front-side window, and Officer Garner asked through the front door for Zumwalt to "come to the door, please." The officers told Zumwalt they had seen him standing by the door. Zumwalt then opened the front door and responded, "Hello?" Zumwalt said he did not know anything about the vehicle damage in the parking lot, but agreed to come out and look with the officers. The officers then commenced a DUI investigation, which was continued at the detention center because the parking lot was icy, applied for a search warrant to draw blood, and arrested Zumwalt in connection with the crash in the parking lot.

¶9     Zumwalt was charged with DUI, failing to stop and provide identification after damaging an unattended vehicle, and failing to carry proof of insurance in his vehicle. His

4

first trial ended in a mistrial due to a hung jury. Zumwalt's primary defense was that he was intoxicated from alcohol he drank after arriving back to his apartment, not before he parked his truck.

¶10 Prior to his second trial, Zumwalt filed two motions to suppress. His first motion was not contested by the City of Whitefish (the City) and was granted, suppressing the "blood results and any evidence gathered by the City as a consequence of the Search Warrant [for his blood]." His second motion sought to suppress all evidence on the ground the officers had conducted an unlawful search by their actions at his apartment. The trial court denied that motion, reasoning that the officers did not violate Zumwalt's reasonable expectation of privacy and therefore did not engage in an unlawful search.

¶11 At the second trial, the City submitted three videos taken by cameras at the apartment complex. The first clip showed a truck backed up at a sharp angle near the front of a car, later crashing into the car. The second clip showed the truck moving forward and backing up again. The third clip showed the truck fully backed into a parking spot, with part of the truck hanging over the edge of the sidewalk, as well as a bearded man getting out of the truck, bracing the truck for support, and approaching the sidewalk.

¶12 Slosson testified and explained that he was in his apartment playing video games around 12:30 in the morning when he heard what sounded like a snow plow. He looked outside and saw the vehicle backing up into the parking space. Slosson said he saw the driver get out of the truck and recognized him as his neighbor, though he did not then know his name. He further testified that the man appeared incoherent and possibly impaired, and

that the truck seemed to be parked further back than the spot allowed. Slosson went outside to investigate and saw the damage to his girlfriend's car, so he called the police about ten minutes later. He testified that the officers arrived in about 15 minutes. A few days after the incident, Slosson contacted Zumwalt for insurance information and gave him a copy of the surveillance footage. Zumwalt told Slosson he did not remember what had happened that night.

¶13 The responding officers testified about their actions that night and were also permitted to discuss their respective experiences dealing with impaired persons generally. Officer Stahlberg testified that he had completed two DUI investigation certification programs, including the Advanced Roadside Impaired Driving Enforcement (ARIDE) program, and had otherwise been involved in over 100 DUI investigations. Sargeant Veneman testified that he had spent approximately forty hours doing clinical impairment detection training and was formerly a drug recognition expert. Officer Garner testified that he had completed ARIDE training and that he had been involved in about 150 DUI investigations.

¶14 Officer Stahlberg testified that, after Zumwalt followed the officers outside of his apartment, he noticed an alcoholic odor from Zumwalt, in addition to slurred speech and an inability to follow basic instructions from the officers. However, the officers did not directly ask Zumwalt whether he had been drinking. On cross-examination, Officer Stahlberg said that, in his opinion, Zumwalt did not drink alcohol inside of his apartment after arriving there that evening. On redirect, the prosecutor asked Officer Stahlberg the

basis for this belief. Officer Stahlberg stated it was Zumwalt's "state of intoxication" and that he did not "believe [Zumwalt] would have consumed that much alcohol [in the apartment]." The defense objected based on speculation and the trial court sustained that objection, prompting the City to lay a foundation for the Officer's testimony. The following exchange then occurred:

Prosecution: How many DUI investigations have you conducted?

Officer Stahlberg: Well over 100.

Prosecution: And how many in addition to those have you just assisted?

Officer Stahlberg: Probably equally the same.

Prosecution: Okay. Have you seen individuals at different states of intoxication?

Officer Stahlberg: Absolutely.

Prosecution: Have you been able to get breath samples or blood samples to see what their actual blood or breath alcohol levels are?

Officer Stahlberg: Yes.

Prosecution: Have you been able to compare, umm, what a person's breath alcohol level is in comparison to what, umm, their behavior is?

Officer Stahlberg: Yes.

Prosecution: Ok. And have you had education on, umm, or do you have personal experience on when you consume alcohol and, umm, and when it affects you essentially?

Officer Stahlberg: Yes.

Prosecution: And have you, umm, had DUI investigations where you have had to deal with folks who have drank at different times and then had to determine their level of intoxication?

7

Officer Stahlberg: Yes.

Prosecution: Is that sufficient your honor?

¶15     At this point, Zumwalt asked the court that this be heard outside the presence of the jury. The judge agreed but then the prosecutor requested leave to "ask a question that was not objected to" in the presence of the jury. The prosecution was allowed to continue:

Prosecution: Have you seen folks, then, at varying levels of intoxication?

Officer Stahlberg: Yes.

Prosecution: And would you be able to say that this is what I think folks look like at a low breath alcohol level and this is what I have personally seen folks look like at a high breath alcohol level?

Officer Stahlberg: Yes.

Prosecution: And how did that compare here?

Officer Stahlberg: I believe he was at a high intoxication level.

Prosecution: Okay, and would that factor into why you did not believe it was the case?

Officer Stahlberg: Correct. Yes.

Prosecution: Anything else that would factor into that?

Officer Stahlberg: The fact that we saw him for approximately five minutes inside the apartment.

Prosecution: Okay.

Officer Stahlberg: Where we actually had eyes on him, and he was not consuming alcohol.

Prosecution: Did you take into account the manner in which his behavior—

8

Defense: Objection, leading.

Prosecution: Uh, can I finish the question first?

Judge: Yeah, I don't know what your question is going to be.

Prosecution: How did his manner of parking affect your decision, your belief, that he did not drink while he was in his apartment?

Officer Stahlberg: Oh, it was definitely not a very typical manner in which people park.

¶16 Officer Garner testified about taking Zumwalt to the detention center to conduct standardized field sobriety tests because the parking lot was icy. Officer Garner stated that Zumwalt showed seven out of eight indicators that he was impaired, and continued to struggle following basic directions. When discussing the sobriety testing on Zumwalt, the following exchange occurred:

Prosecution: I guess I need to lay the foundation for this. Have you, umm, in your field of investigations, have you seen folks that you've later verified by a breath or blood have varying levels of blood alcohol levels?

Officer Garner: Various levels?

Prosecution: Right. So, have you seen folks that provide you a breath sample close to .08?

Officer Garner: Yes.

Prosecution: Have you seen folks . . . how high have you seen folks?

Zumwalt then objected based on relevance. The prosecutor responded that she was "laying the foundation to ask a question" and "just trying to do this ahead of an objection." The court allowed the prosecutor to continue:

Prosecution: How high have you seen folks?

9

Officer Garner: I've seen folks in the upper threes.

Prosecution: Ok. And did it appear that the defendant's level of intoxication was increasing while you were with him?

Zumwalt objected based on speculation and foundation. The judge told the prosecutor he would allow just that question and the prosecutor again continued:

Prosecutor: During the time that you spent with him—so you were there when he got out of his apartment to the end of the time you spent with him— did it appear that his level of intoxication increased?

Officer Garner: No.

¶17 During closing arguments, the City emphasized the videos of the accident that showed Zumwalt crashing into the other vehicle, in addition to Zumwalt's expressed lack of memory about the accident. The City also discussed the officers' experiences with Zumwalt that evening and their testimony that they believed Zumwalt was intoxicated while driving.

¶18 Zumwalt's counsel argued the officers conducted an inadequate investigation, and that Zumwalt had enough time to become intoxicated in the twenty-five minutes after he got home and before the police arrived. He also stressed the fact that no one asked him if he had been drinking throughout the duration of his encounter with law enforcement.

¶19 The jury found Zumwalt guilty of DUI pursuant to § 61-8-401(1)(a), MCA. Zumwalt appealed his conviction to the Eleventh Judicial District Court, contending the trial court erred by denying his motion to suppress for an illegal search and otherwise improperly permitted the officers to testify regarding their opinion as to Zumwalt's level

intoxication in relation to his alleged time of consumption. The District Court rejected those arguments and affirmed his conviction.

¶20   Zumwalt appeals.

## STANDARD OF REVIEW

¶21   On appeal of a district court's appellate review of a municipal court's ruling, we review the municipal court's ruling as if it were on direct appeal to this court. *State v. Hoover*, 2017 MT 236, ¶ 12, 388 Mont. 533, 402 P.3d 1224.

¶22   This Court reviews the denial of a motion to suppress to determine if the trial court's factual findings are clearly erroneous and whether its applications of law are correct. *State v. Dunn*, 2007 MT 296, ¶ 7, 340 Mont. 31, 172 P.3d 110. "A court's findings prove clearly erroneous if they are not supported by substantial evidence, the court misapprehended the effect of the evidence, or we are convinced by our review of the record that the [trial court] made a mistake." *State v. Ellington*, 2006 MT 219, ¶ 9, 333 Mont. 411, 143 P.3d 119.

¶23   We review a trial court's admission of evidence for abuse of discretion. *State v. Ailer*, 2018 MT 18, ¶ 9, 390 Mont. 200, 410 P.3d 964. While we give trial courts "broad discretion to determine the admissibility of evidence," we nevertheless will find an abuse of discretion when a trial court "acts arbitrarily without conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice." *Ailer*, ¶ 9.

**DISCUSSION**

¶24 *1. Whether the Municipal Court erred by denying Zumwalt's motion to suppress?*

¶25 Both the United States Constitution and the Montana Constitution protect an individual's right to be free from unreasonable search and seizure. U.S. Const. amend. IV; Mont. Const. art. II, § 11. This includes an individual's right to "be secure in their persons, houses, papers, and effects . . . ." U.S. Const. amend. IV; *see* Mont. Const. art. II, § 11. In determining if a search violated the Montana Constitution, we look to two factors in particular: "(1) whether the person has an actual expectation of privacy that society is willing to recognize as objectively reasonable, and (2) the nature of the state's intrusion." *City of Whitefish v. Large*, 2003 MT 322, ¶ 14, 318 Mont. 310, 80 P.3d 427. "Whether an individual had a subjective expectation of privacy, and whether such expectation was objectively reasonable in society, are mixed questions of fact and law under the totality of the circumstances of each case." *State v. Staker*, 2021 MT 151, ¶ 11, 404 Mont. 307, 489 P.3d 489. If this Court finds that there is no reasonable expectation of privacy, "there is no constitutional intrusion, search, or seizure under Article II, Sections 10-11." *Staker*, ¶ 11. Actions constituting a search must be supported by a warrant or fall into one of a "few carefully drawn exceptions." *State v. Elison*, 2000 MT 288, ¶ 39, 302 Mont. 228, 14 P.3d 456.

¶26 Zumwalt argues that the officers violated his objectively reasonable expectation of privacy when they peered into his apartment from a few feet away. He thus contends this constituted an unlawful search and that the evidence secured as a result of the search must

12

be excluded. The City responds that officers did not conduct a search because they were not within the curtilage of Zumwalt's apartment, but remained within open, common areas of the complex for which there was no indication of a claimed privacy interest. Alternatively, even if a search occurred, the City argues that the investigation undertaken after Zumwalt voluntarily came out of his apartment was not the fruit of the search.

¶27 While the Montana Constitution affords broad protection against unreasonable search and seizure, the right to individual privacy is not absolute. *Hulse v. DOJ, Motor Vehicle Div.*, 1998 MT 108, ¶ 27, 289 Mont. 1, 961 P.2d 75. "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *State v. Ditton*, 2006 MT 235, ¶ 51, 333 Mont. 483, 144 P.3d 783 (quoting *Katz v. United States*, 389 U.S. 347, 351, 88 S. Ct. 507, 511 (1967)). As such, "the mere fact that an individual has taken measures to restrict some views of his activities [does not] preclude an officer's observations from a public vantage point where he has the right to be and which renders the activities clearly visible." *State v. Cotterell*, 2008 MT 409, ¶ 39, 347 Mont. 231, 198 P.3d 254 (quoting *California v. Ciraolo*, 476 U.S. 207, 213, 106 S. Ct. 1809, 1812 (1986)).

¶28 The record indicates there were no signs, gates, or other indicators that restricted the officers or other persons from entry to the apartment building complex or to the common areas surrounding Zumwalt's apartment complex. The officers approached the apartment by walking on an open sidewalk traversing the property and leading to a laundry facility. When Officer Stahlberg and Sargeant Veneman moved to the rear of the property, initially

13

to prevent someone from escaping, they did so through an open and grassy area that was accessible by other tenants and not closed to the public. Standing in a space that was not segmented or otherwise designated as private, or restricted to Zumwalt's personal use, the officers observed an individual through a partially uncovered window. On these facts, we cannot conclude the surrounding common area came within Zumwalt's apartment's "curtilage"—the area outside a dwelling that one "reasonably may expect . . . should be treated as the home itself." *Dunn*, 480 U.S. at 300, 107 S. Ct. at 1139. Zumwalt would not have had a reasonable expectation that the common areas of the facility would be considered or intended to be for his private use.

¶29 Notwithstanding Zumwalt's claimed privacy interest, the nature of the officers' purported intrusion here was minimal when viewed within our precedent. In *State v. Bullock*, 272 Mont. 361, 384, 901 P.2d 61, 76 (1995), we found a search overly intrusive when officers, while conducting a criminal investigation, disregarded posted warning signs, ignored a past practice of requesting permission to enter the defendant's property, and entered private property that was gated. In contrast, we found a search to be only minimally intrusive when officers "simply parked in the general parking area routinely used by other visitors" and did not "hop fences" or "slip through bushes intended to screen the home." *State v. Hubbel*, 286 Mont. 200, 210, 951 P.2d 971, 977 (1997); *see also Large*, ¶¶ 9-10 (ruling that officers did not conduct a search on the defendant's carport even though its entrance was screened off from the public because "there was nothing to prevent other condominium unit owners and their visitors from viewing the interior of Large's carport.").

14

¶30 Here, as the District Court determined, the officers' tactics were not aggressive in investigating the incident. Police first confirmed that the truck involved in the accident belonged to Zumwalt and that his address was listed as Unit 9 of the apartment complex. They repeatedly knocked on the front door and asked Zumwalt to answer. The officers did not manipulate any of Zumwalt's property or bypass any indications within the complex that any area was intended to be for Zumwalt's personal use or was otherwise restricted, and they remained in areas that were accessible by others. After he opened the door, Zumwalt voluntarily spoke with officers about the accident. Under the facts of this case, we conclude that the trial court did not err in denying Zumwalt's motion to suppress.

¶31 *2. Whether the Municipal Court abused its discretion by allowing officers to give opinion testimony about Zumwalt's degree of intoxication relative to the alleged time he consumed alcohol and, if so, whether the error was harmless?*

¶32 Zumwalt argues in the alternative that the City improperly elicited expert opinion testimony without laying an adequate foundation, requiring a new trial. Specifically, he asserts that the officers did not base their respective opinions about the body's absorption of alcohol on the application of scientific principles, and thus lacked a sufficient foundation to testify about their opinions regarding when Zumwalt last consumed alcohol.

¶33 Under Montana Rule of Evidence 701, a lay witness is allowed to "give an opinion rationally based on the person's perception and helpful to a clear understanding of the person's testimony or the determination of a fact in issue." *State v. Nobach*, 2002 MT 91, ¶ 14, 309 Mont. 342, 46 P.3d 618. However, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in

15

issue," a witness providing such assistance must be "qualified as an expert by knowledge, skill, experience, training, or education . . . ." M. R. Evid. 702.

¶34 "We have precedent recognizing lay witness testimony regarding a person's state of intoxication based on the witness's personal observations." *State v. Snell*, 2004 MT 334, ¶ 46, 324 Mont. 173, 103 P.3d 503. This is because "most adults are sufficiently experienced with people who have been drinking to offer an opinion that a person is, in fact, intoxicated from alcohol based on their personal observations." *Nobach*, ¶ 15. However, we conclude here that the testimony regarding absorption of alcohol by Officer Stahlberg and Officer Garner lacked a sufficient foundation because their testimony exceeded an opinion premised upon purely personal observations or experiences with Zumwalt, and included proffered scientific calculation.

¶35 Zumwalt's defense at trial was that he consumed alcohol after he arrived back at his apartment but before the officers arrived. The City responded by presenting testimony from Officer Stahlberg who opined that Zumwalt could not have consumed that much alcohol in the apartment because of his "state of intoxication." Officer Garner later suggested the same thing during his testimony. While each officer's testimony was premised primarily on their personal observations of Zumwalt, the testimony implicitly provided a technical analysis concerning Zumwalt's state of intoxication relative to when he supposedly consumed alcohol. The only foundation laid by the prosecutor on this point was asking the officers if they had seen individuals at different levels of intoxication and compared that to their respective BACs. As Zumwalt argues, however, this foundation is

16

insufficient because it did not establish that the officers were qualified to testify about what factors may have affected Zumwalt's rate of absorption and how quickly the effects of intoxication would manifest over a certain amount of time. While "common experiences" formed part of the foundation for the officers' testimony, the essential question that pertained to Zumwalt's defense—*when* he consumed the alcohol—turned on specialized knowledge beyond mere observation. Accordingly, the officers provided expert opinion for which the foundation was insufficient. The trial court therefore abused its discretion by admitting the officers' opinions on whether Zumwalt could have consumed alcohol exclusively in his apartment.

¶36    Pursuant to § 46-20-701(1), MCA, we consider whether this error was harmless. The improper admission of evidence is "trial error" and therefore subject to harmless error review. *State v. Grimshaw*, 2020 MT 201, ¶ 29, 401 Mont. 27, 469 P.3d 702. An error is harmless "if the fact-finder was presented with admissible evidence that proved *the same facts as the tainted evidence proved.*" *State v. Staudenmayer*, 2023 MT 3, ¶ 28, 411 Mont. 167, 523 P.3d 29 (quoting *State v. Van Kirk*, 2001 MT 184, ¶ 43, 306 Mont. 215, 32 P.3d 735) (emphasis in original). Hence, in the DUI context, we have explained that the State must demonstrate that: "(a) there was other admissible (cumulative) evidence demonstrating the 'under the influence' element of the crime charged; and (b) that, qualitatively, no reasonable possibility exists that the tainted evidence might have contributed to the defendant's conviction." *Van Kirk*, ¶ 48.

¶37 Here, we conclude there was sufficient record evidence outside of the officers' flawed expert testimony to prove the same fact—that Zumwalt was intoxicated while driving his truck. Slosson testified that Zumwalt struggled to maintain his balance when exiting the truck and appeared to be impaired. The video evidence from the apartment complex showed Zumwalt driving his truck erratically, hitting another vehicle, improperly parking his car after several attempts and ending up on the sidewalk, and staggering after exiting the vehicle. In the days following the incident, Zumwalt admitted to Slosson that he did not remember the incident. And, the officers' other testimony indicated that they observed Zumwalt's slurred speech and glossy eyes throughout the evening, during which Zumwalt's level of impairment appeared to remain the same. They confirmed his degree of intoxication through eight field sobriety tests. In view of the entire record, we cannot conclude the error in admitting the erroneous testimony prejudiced the outcome of at trial.

¶38 Affirmed.

/S/ JIM RICE

We concur:

/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR